**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND**, | Case No. 3:20-cv-00156-IM (Lead Case) |
| Plaintiff, | Case No. 3:20-cv-00309-IM (Member Case) |
| v. | **OPINION AND ORDER** |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 483**, | |
| Defendant. | |
| **PACIFIC NORTHWEST IRONWORKERS AND EMPLOYERS APPRENTICESHIP AND TRAINING TRUST**, | |
| Plaintiff, | |
| v. | |
| **BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND**, | |
| Defendant. | |

Robert B. Miller, Kilmer, Voorhees & Laurick, P.C., 732 N.W. 19th Ave., Portland, Oregon, 97209. Attorney for the Fund.

Darian Stanford, Tonkon Torp LLP, 888 S.W. Fifth Avenue, Suite 1600, Portland, Oregon 97204, and Joseph A. Hamell, Montgomery Purdue Blankinship & Austin, PLLC, 5500 Columbia Center, 701 Fifth Avenue, Seattle, Washington 98104. Attorneys for Employers.

**IMMERGUT, District Judge.**

This consolidated matter comes before the Court on cross-motions for summary judgment.[1] ECF 23; ECF 27. The parties seek judicial review of two arbitration awards determining the proper calculation for withdrawal liability under the Employee Retirement Income Security Act ("ERISA"). The arbitrators considered the same legal question and reached opposite results. The narrow question presented is whether, when calculating annual payments for withdrawal liability from a multiemployer pension plan, the statutory formula—specifically, the "highest contribution rate at which an employer had an obligation to contribute" "arising under" a collective bargaining agreement ("CBA")—includes supplemental contribution rates in furtherance of a rehabilitation plan[2] which are adopted in a CBA.[3] 29 U.S.C. §§ 1392(a); 1399(c)(1)(C)(i)(II).

---

[1] For the sake of clarity, all citations to ECF docket numbers will refer to the docket submissions in the lead case, Docket No. 3:20-cv-156, except where otherwise specified.

[2] The parties agree that supplemental contribution rates adopted under a rehabilitation plan during years after the Multiemployer Pension Reform Act of 2014 ("MPRA") became effective are not included in this calculation. *See* 29 U.S.C. § 1085(g)(3)(A); ECF 1 at ¶ 13 (stating that Fund did not include rehabilitation contributions in its calculations for years after the MPRA became effective); ECF 23 at 14; *Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 802 F.3d 534, 538 (3d Cir. 2015) ("This amendment does not affect the surcharges here as they accrued before December 31, 2014.").

[3] In addition to this narrow question, the parties sparsely brief the question of whether the supplemental contribution rates at issue might be included on another basis: as an "obligation to contribute arising" "as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). However, because the parties do not fully argue this issue and because this

In Case No. 3:20-cv-00309-IM, Plaintiff Pacific Northwest Ironworkers and Employers Apprenticeship and Training Trust ("Ironworkers") sues the Board of Trustees of the Western States Office and Professional Employees Pension Fund ("Fund") to vacate the arbitrator's decision that the Ironworkers' rehabilitation contribution rates *are* included in the statutory formula that determines their withdrawal liability annual payment. Case No. 3:20-cv-309 ("20-309"), ECF 1 at ¶ 4. In Case No. 3:20-cv-00156-IM, the same Fund serves as Plaintiff, suing the International Brotherhood of Electrical Workers Local 483 ("IBEW") to vacate the arbitrator's decision that the IBEW's rehabilitation contribution rates are *not* included in the formula. ECF 1 at ¶ 15. The Ironworkers and IBEW are collectively referred to here as "Employers."

Oral argument was held on these cross-motions on October 30, 2020. ECF 33. As explained below, the Court concludes that the withdrawal liability formula includes those pre-MPRA rehabilitation contribution rates adopted in the CBA. Accordingly, the Court GRANTS the Fund's Motion for Summary Judgment, ECF 27, and DENIES the Employers' Motion for Summary Judgment, ECF 23. The Court affirms and enforces the Ironworkers Award and vacates the IBEW Award.

## FACTUAL AND PROCEDURAL BACKGROUND

IBEW and Ironworkers participated in the Western States Office and Professional Employees Pension Fund ("Fund"). ECF 13 at 2–3. The Fund is a multiemployer pension fund maintained and administered to provide retirement benefits to qualified labor employees. ECF 1 at ¶ 4. It is established and maintained pursuant to ERISA. *Id.*

---

Court does not need to reach this issue to rule on these cross-motions, the Court declines to address it.

In 2009, the Fund "notified all participating employers," including both IBEW and Ironworkers, "that the Pension Fund was in critical status, that each participating employer was obligated to pay a statutory surcharge," and "that the Pension Fund had adopted a rehabilitation plan." ECF 1 at ¶ 7. The Fund "unilaterally adopted a rehabilitation plan" on October 16, 2009. ECF 1-1 at 3. The rehabilitation plan included two contribution schedules, one of which was designated the default schedule. ECF 26-2 at 431; ECF 23 at 15.

In and after 2010, the Ironworkers adopted a new CBA. 20-309, ECF 1 at ¶ 11. In and after 2010, IBEW adopted a new CBA. ECF 1 at ¶ 11. In these CBAs, the Employers "agreed to make supplemental contributions in order to contribute at a rate consistent with those published by the Pension Fund in furtherance of the rehabilitation plan." *Id.* at ¶ 12. *See also* 20-309, ECF 1 at ¶ 11 (describing these facts as paying the "rate required by the Rehabilitation Plan").

In 2014, Congress passed the Multiemployer Pension Reform Act ("MPRA"), which provided that "supplemental contribution rates for plan years beginning after December 31, 2014 were excluded from the highest contribution rate for the purpose of computing withdrawal liability under 29 U.S.C. § 1399(c)(1)(C)(i)." ECF 1 at ¶ 13.

On September 1, 2016, the Ironworkers withdrew from the Fund. 20-309, ECF 1 at ¶ 12. In 2016, IBEW also withdrew from the Fund. ECF 1 at ¶ 9. In its calculation of withdrawal liability for both Employers, the Fund included "the pre-MPRA supplemental contributions" included in the Employers' respective CBAs. *Id.* at ¶¶ 14–15. Both Employers disputed this inclusion within the withdrawal liability formula, and the parties proceeded to arbitration.

In IBEW's arbitration, the arbitrator concluded that the Fund erred by including the pre-MPRA rehabilitation contribution rates which were included in IBEW's CBA in its calculation of IBEW's withdrawal liability. *Id.* In the Ironworkers' arbitration, the arbitrator concluded that

the Fund did not err by including these contribution rates. 20-309, ECF 1 at ¶ 18. In both matters,

the losing party appealed the arbitration award. The IBEW and Ironworkers cases are now

consolidated before this Court. *See* ECF 16.

## LEGAL STANDARDS

The Employee Retirement Income Security Act ("ERISA") authorizes judicial review "to

enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). The arbitrator's

findings of fact are presumed correct, *id.* at § 1401(c), but "the court may review *de novo* all

conclusions of law." *Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc*., 784 F.2d 926, 929

(9th Cir. 1986). "Statutory interpretation is a question of law subject to de novo review." *Id.*

## STATUTORY BACKGROUND

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C.

§§ 1381–1461, amended ERISA to include mandatory liability for employers withdrawing from

established pension plans. *CMSH Co. v. Carpenters Tr. Fund for N. Cal.*, 963 F.2d 238, 239 (9th

Cir. 1992). If a dispute arises between the employer and the plan sponsor regarding a withdrawal

liability determination, the parties are required to resolve it through arbitration. 29 U.S.C.

§ 1401(a)(1).

The Pension Protection Act of 2006 ("PPA"), codified as amended throughout Chapter

26 and Chapter 29 U.S.C., "is designed to help severely underfunded multiemployer pension

plans recover." *Lehman v. Nelson*, 862 F.3d 1203, 1207 (9th Cir. 2017). "The law is far-

reaching, totaling approximately one thousand pages, and introduced a number of mechanisms

aimed at stabilizing pension plans and ensuring that they remain solvent." *Trs. of Local 138

Pension Tr. Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 130 (2d Cir. 2012). Among these

mechanisms are the rehabilitation plan and surcharge requirements. *Id.* at 130–31; *see also* 29

U.S.C. § 1085(e)(3) (rehabilitation plan); 29 U.S.C. § 1085(e)(7) (surcharge).

In 2014, Congress further amended ERISA by passing the Multiemployer Pension Reform Act ("MPRA"), which directs that "increase[s] in the contribution rate" that are made "in order to enable the plan to meet the requirement of the . . . rehabilitation plan" are not to be included in the calculation of "the highest contribution rate under section 1399(c)," which determines withdrawal liability. 29 U.S.C. § 1085(g)(3)(A).

## A. Entry into Critical Status and Enforcement

29 U.S.C. § 1085 provides "[a]dditional funding rules for multiemployer plans in endangered status or critical status." For purposes of this matter, two relevant statutory provisions are triggered when a plan enters critical status: (1) the rehabilitation plan requirement, governed by 29 U.S.C. § 1085(e)(3); and (2) an automatic surcharge requirement, governed by 29 U.S.C. § 1085(e)(7).

### 1. The Rehabilitation Plan

Upon a plan's entry into critical status, the plan sponsor is required to "adopt and implement a rehabilitation plan" formulated "to enable the plan to cease to be in critical status by the end of the rehabilitation period." 29 U.S.C. §§ 1085(a)(2)(A), (e)(3)(A)(i). A rehabilitation plan includes, among other things, "options or a range of options to be proposed to the bargaining parties" that will enable the plan to leave critical status. *Id.* at § 1085(e)(3)(A)(i). "One schedule shall be designated as the default schedule." *Id.* at § 1085(e)(1)(B).

The process for implementing rehabilitation plans is as follows. "[W]ithin 30 days after the [plan sponsor's] adoption of the rehabilitation plan," the sponsor "shall provide to the bargaining parties 1 or more schedules showing revised benefit structures, revised contribution structures, or both, which, if adopted, may reasonably be expected" to move the plan out of critical status. *Id.* at § 1085(e)(1)(B). The plan sponsor "may . . . provide the bargaining parties

with additional information." *Id.* When the CBA that was in effect when the fund enters critical

status expires, the parties have 180 days to bargain over which, if any, of these rehabilitation

schedules will be adopted in the next CBA. *Id.* at § 1085(e)(3)(C).

Section 1085(e)(3)(C) is titled "Imposition of schedule where failure to adopt

rehabilitation plan." *Id.* at § 1085(e)(3)(C). Under this provision, if the bargaining parties "fail to

adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule

from the plan sponsor" within the allotted time, "the plan sponsor shall implement the [default]

schedule." *Id.* at § 1085(e)(3)(C)(i). If a party fails to make a contribution under a section

1085(e)(3)(C)-imposed schedule, that obligation is enforced through section 1085(e)(3)(C)(iv).

This enforcement provision states, "Any failure to make a contribution under a schedule of

contribution rates provided under this subsection shall be treated as a delinquent contribution

under section 1145 of this title and shall be enforceable as such." *Id.* at § 1085(e)(3)(C)(iv).

"Section 1145" here refers to 29 U.S.C. § 1145, ERISA's enforcement provision that

predates the passage of the PPA. ERISA's enforcement provision, section 1145, provides,

"[e]very employer who is obligated to make contributions to a multiemployer plan under the

terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not

inconsistent with law, make such contributions." 29 U.S.C. § 1145. Section 1145 "plainly

describes the employer's contractual obligation to make contributions but omits any reference to

a noncontractual obligation." *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced

Lightweight Concrete Co., Inc.*, 484 U.S. 539, 546 (1988). Therefore, if (1) the bargaining parties

fail to adopt in their CBA a rehabilitation contribution rate that is consistent with the

rehabilitation plan and a provided schedule, and (2) a party then fails to make a contribution

under an imposed schedule, this non-CBA-imposed obligation is treated *as though* it is a

"delinquent contribution" within section 1145, the enforcement provision that governs CBA obligations. 29 U.S.C. at § 1085(e)(3)(C)(iv); *see also id.* at § 1085(e)(3)(C)(i) (referring to the provision directing that one schedule "provide[d] to the bargaining parties" "shall be designated as the default schedule"); *id.* at § 1085(e)(1)(B) (that provision).

### 2.  The Automatic Employer Surcharge

Upon a fund's entry into critical status, in addition to the initiation of the rehabilitation plan process, an "[a]utomatic employer surcharge" is imposed on the employer. *Id.* at § 1085(e)(7)(A). This surcharge payment ends "beginning on the effective date of a [CBA] that includes terms consistent with [a plan sponsor-provided schedule]." *Id*. § 1085(e)(7)(C).

Compliance with the surcharge requirement is assured by the enforcement provision within section 1085(e)(7), which states that "[a]ny failure to make a surcharge payment shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." *Id.* at § 1085(e)(7)(B). Thus, the PPA enforces this statutory obligation again by referencing ERISA's existing contractual-obligation enforcement provision, section 1145.

### B.  Withdrawal and Calculation of Withdrawal Liability

Under the MPPAA, "when an employer completely withdraws from a multiemployer pension plan, the employer incurs withdrawal liability that corresponds to the value of benefits in the plan that have vested and are attributable to its employees."[4] *Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.,* 802 F.3d 534, 537 (3d Cir. 2015); 29 U.S.C. § 1381. Employers may satisfy the withdrawal liability with a single payment of the sum or

---

[4] Employers state that withdrawal liability is incurred for withdrawal from an "underfunded plan," ECF 23 at 10, but it appears that the withdrawals liability applies whether or not the plan is underfunded. *See* 29 U.S.C. § 1381 ("If an employer withdraws from a multiemployer plan . . . ."); *CMSH*, 963 F.2d at 239 ("The [MPPAA] amended ERISA to include mandatory liability on employers withdrawing from established pension plans.").

through annual payments. Annual payments are calculated using the "highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C. § 1399(c)(1)(C)(i). For the purpose of this calculation, the MPPAA defines "Obligation to Contribute" under 29 U.S.C. § 1392(a) as:

> an obligation to contribute arising –
>
> (1) under one or more collective bargaining (or related) agreements, or
>
> (2) as a result of a duty under applicable labor-management relations law, but
>
> does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

In this case, the parties dispute whether supplemental contribution rates adopted in furtherance of the rehabilitation plan and included in a CBA constitute "an obligation to contribute arising" "under" a CBA. *Id.* at § 1392(a).[5]

## C. The MPRA

In 2014, Congress enacted the MPRA, which added to the PPA 29 U.S.C. § 1085(g)(3)(A). This statutory amendment explicitly excludes "increase[s] in the contribution rate" that are made "in order to enable the plan to meet the requirement of the . . . rehabilitation

---

[5] The parties also dispute in their cross-motions whether these rehabilitation contribution rates constitute "an obligation to contribute arising" "as a result of a duty under applicable labor-management relations law," 29 U.S.C. § 1392(a), though the parties do not spend nearly as much time on this question. *See* ECF 23 at 37–39; ECF 27 at 31; ECF 29 at 21; ECF 30 at 19. The Court declines to address this question because the basis for inclusion discussed in text—as an obligating arising under a CBA—provides a sufficient ground on which to resolve these cross-motions.

plan" from the calculation of "the highest contribution rate under section 1399(c)," which determines withdrawal liability. *Id.* This provision provides:

> Any increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section 1391 of this title and in determining the highest contribution rate under section 1399(c) of this title, except for purposes of determining the unfunded vested benefits attributable to an employer under section 1391(c)(4) of this title or a comparable method approved under section 1391(c)(5) of this title.

29 U.SC. § 1085(g)(3)(A). The Fund did not include rehabilitation contribution rates in its calculations for years after the MPRA became effective. ECF 1 at ¶ 13-14. The MPRA amendments "are likely not retroactive amendments," *Serv. Emps. Int'l Union Nat. Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 358 F. Supp. 3d 12, 21 (D.D.C. 2019), and no party to these cross-motion suggests they are. *See note* 2. As such, the MPRA does not govern the issue presented in this case, which concerns only pre-MPRA years' rehabilitation contribution rates that are included in a CBA.[6]

## DISCUSSION

To calculate a withdrawal liability under § 1399, the Fund must use the "highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C. § 1399(c)(1)(C)(i). For this calculation, the term "obligation to contribute" means "an obligation

---

[6] Both the Fund and Employers make arguments regarding the MPRA through a legislative history analysis, addressed below.

to contribute arising – (1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law . . . ." *Id.* at § 1392(a).

## A. Arising Under the CBAs

The Employers contend that the statute's plain language, the interpretive canon that all provisions of a statute must be given effect, and persuasive precedent support the conclusion that pre-MPRA rehabilitation contribution rates adopted in a CBA are not an "obligation to contribute" arising under a CBA for purposes of calculating withdrawal liability. *See* ECF 23 at 19–25.

### 1. Plain Meaning of "Arising"

Whether rehabilitation contribution rates that are adopted in a CBA arise under the CBA for purposes of calculating ERISA withdrawal liability is a question of first impression in the Ninth Circuit. *See* ECF 30 at 20.

"To determine the meaning of a term in a federal regulation, we look to the common meaning of the word." *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005). Employers explain that in this Circuit, "arise" is "understood to mean originating from, having its origin in, growing out of or flowing from." ECF 23 at 25 (quoting *United States ex rel. Welch v. My Left Foot Child.'s Therapy, LLC*, 871 F.3d 791, 798 (9th Cir. 2017)); *see also Trs. of W. States Office & Pro. Emps. Pension Fund v. Welfare & Pension Admin. Serv., Inc.*, No. 3:19-cv-00811-SB, 2020 WL 2545315, at *5–6 (D. Or. May 19, 2020) (describing similar definitions used by courts such as "come into being," "originate," and "spring up").

The Employers draw a distinction between (1) the origin of the rehabilitation contribution rates that are adopted in the CBA, and (2) the collective bargaining process. They argue that the "rehabilitation plan supplemental contributions cannot fall within [the definition of collective bargaining] because they were never subject to 'negotiation' by the bargaining parties." ECF 23

at 26 (emphasis omitted). They argue that the rehabilitation contributions are "[l]ike the surcharge," because "employers have no opportunity to bargain down the rates, or raise the rates in exchange for other concessions. If there is no opportunity to bargain over the level of rates, they by definition cannot 'originate from' the collective bargaining process or a CBA." ECF 29 at 7.

However, an inability to "bargain down the rates" does not mean that the adoption of a given rehabilitation contribution schedule within the CBA was not negotiated. As every relevant provision to the process for implementing and enforcing the rehabilitation plan shows, the inclusion of a given rehabilitation contribution rate *is* subject to negotiation during collective bargaining.

After a pension fund enters critical status, an employer has choices as to rehabilitation contribution rates. 29 U.S.C. § 1085(e)(3)(A) explains that a rehabilitation plan is a proposal that sets out "a range of options ***to be proposed*** to the bargaining parties . . . to enable the plan to cease to be in critical status . . . ***if agreed to*** by the bargaining parties" (emphasis added). 29 U.S.C. § 1085(e)(1)(B)(i) explains that the various rehabilitation schedules "provide[d] to the bargaining parties," "if adopted," should each "reasonably be expected to" help the plan "emerge from critical status." As such, the statutory language referring to the rehabilitation plan process explicitly states that none of the plan sponsor-provided schedules are *required* to be included in a post-critical status CBA, and repeatedly refers to "bargaining parties." Only if the bargaining parties "adopt" or "agree[] to" any of the proposals does inclusion of a rehabilitation contribution schedule in a CBA occur.

The statute also includes a provision titled "Imposition of schedule where failure to adopt rehabilitation plan." 29 U.S.C. § 1085(e)(3)(C). This provision provides for the situation where,

"after receiving one or more schedules from the plan sponsor . . . the bargaining parties . . . *fail to adopt* a contribution schedule with terms consistent with the rehabilitation plan." *Id.* at § 1085(e)(3)(C)(i)(II) (emphasis added). Not only are the schedules proposed for potential "adoption," but the statute anticipates that the Employers might *not choose* to adopt a plan sponsor-provided schedule in the CBA.

Further, the statutory language repeatedly refers to the post-critical status, newly negotiated CBA as potentially "consistent" or "in accordance" with the plan sponsor's rehabilitation plan and provided schedule. *See, e.g.,* 29 U.S.C. § 1085(e)(3)(C)(i)(II) ("fail to adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule from the plan sponsor"); 29 U.S.C. § 1085(e)(3)(C)(ii)(I) ("a [CBA] providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan"); 29 U.S.C. § 1085(e)(3)(C)(ii)(II) ("fail to adopt a contribution schedule with terms consistent with the updated rehabilitation plan and a schedule from the plan sponsor"). The text of 29 U.S.C. § 1085(e) demonstrates that the parties have choices and that the inclusion of rehabilitation contribution rates in a CBA is subject to bargaining. The statutory language recognizes the distinction between negotiated inclusion of rehabilitation contribution rates and unilaterally imposed rates. A rehabilitation contribution rate adopted in a CBA therefore "originates from" those negotiations, and thus from the CBA.

## 2. Precedent

There is limited case law interpreting the "obligation to contribute" provision. Employers seek to draw an analogy between this case and *Board of Trustees of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 802 F.3d 534 (3d Cir. 2015). In that case, as here, a pension fund entered critical status. As explained above, when a fund enters critical status, the plan sponsor must "adopt and implement a rehabilitation plan." *Id.* at 538. However, *C&S* focused on

another consequence of entry into critical status: the automatic surcharge. "[T]he PPA imposes

an automatic surcharge from 30 days after the employer has been notified that the plan is in

critical status until the adoption of a new CBA in accordance with the rehabilitation plan." *Id.* In

*C&S*, the pension fund included that surcharge in its calculation of the withdrawal liability, and

the Third Circuit found this inclusion incorrect as a matter of law. It explained that the

surcharge's enforcement provision, 29 U.S.C. § 1085(e)(7)(B), is necessary because "surcharges

are noncontractual obligations created by Section 1085(e)(7), [and] they are not within the scope

of Section 1145," the enforcement provision for CBA obligations. *Id*. at 543. *C&S* also stated

that "[i]n order to give effect to Section 1085(e)(7)(B) [the surcharge enforcement provision],"

the surcharge cannot "arise under the CBAs." *Id*. at 544. The Third Circuit further explained that

the surcharge cannot be included in the withdrawal liability calculation "unless it is part of the

highest contribution *rate*." *Id*. at 544 (emphasis in original).

    Employers argue that *C&S* determines the outcome of this case, ECF 23 at 23–25, but

*C&S* is distinguishable on multiple grounds. First, unlike a surcharge, a rehabilitation

contribution rate is clearly a "rate" capable of inclusion within the withdrawal liability

calculation. Second, the surcharge is a statutorily mandated payment that occurs automatically

upon a fund's entering critical status rather than a negotiated contribution rate adopted in a CBA.

In this case, the post-critical status CBA explicitly includes a rehabilitation contribution rate

when the Employers had the choice not to include it. Unlike with the statutorily mandated

surcharge, the parties in this case could have included the rehabilitation contribution rate within

the CBA, not included it and accepted the default rate, or withdrawn from the Fund. Given those

options, the Employers agreed to a new CBA that included a rehabilitation contribution rate.

Third, the *C&S* court's concern about giving effect to all statutory provisions is not

determinative here. Unlike with the automatic surcharge, there are multiple rehabilitation

schedules. The fact that *contractual* obligations to pay rehabilitation contributions are enforced

under section 1145 does not render section 1085(e)(3)(C)(iv) meaningless. Section

1085(e)(3)(C)(iv) continues to be a necessary mechanism to enforce noncontractual

rehabilitation contributions imposed by law under section 1085(e)(3)(C). This Court accepts that

*some* rehabilitation contribution rates do not arise under a CBA, but some do—including the

ones at issue in this case. As such, Employers go too far here in arguing that *C&S* "confirms"

that "rehabilitation plan contribution rates must be excluded from withdrawal liability

payments." ECF 23 at 23.

      The same issue exists with Employers' reliance on *Trustees of Western States Office and*

*Professional Employees Pension Fund v. Welfare & Pension Administration Service, Inc.*

*("WPAS")*, No. 3:19-cv-00811-SB, 2020 WL 2545315 (D. Or. May 19, 2020). *See* ECF 23 at

30–31. *WPAS* does not address the precise question presented in this case. That case, like *C&S*,

addressed only the "10 percent surcharge that the PPA imposes on an employer as a result of the

plan reaching critical status," rather than rehabilitation contribution rates included in a CBA.

*WPAS*, 2020 WL 2545315, at *5 (quotations omitted). In *WPAS*, the court found the surcharge

was not properly included in the calculation of withdrawal liability because "[h]ad Congress not

enacted the PPA in 2006 and imposed a surcharge on an employer when a plan reaches 'critical

status,' as defined by the PPA, WPAS would not have incurred a surcharge based solely on its

status as a contributing employer under the CBA." *Id.* at *6. Here, however, the Employers are

not subject to a rehabilitation contribution rate included within their CBA solely by reason of

their being a contributing employer under a CBA. They are subject to it because they agreed,

during negotiations subsequent to the plan's entry into critical status, to put a rehabilitation contribution rate in the new CBA.

The Employers' reliance on two arbitration decisions, *Domtar Corp. v. Pace Industry Union-Management Pension Fund*, ECF 25-1, and *Commencement Bay Corrugated, Inc. (CBC) v. Pace Industry Union-Management Pension Fund*, ECF 25-2, is similarly unavailing. *See* ECF 23 at 31. Although those decisions concluded that certain rehabilitation contribution rates should not have been included in withdrawal liability calculations, the rehabilitation contribution rates at issue in those arbitrations were not included in the CBAs. As the Ironworkers arbitrator explained, "those cases address the different question of whether contribution increases, imposed by law pursuant to 29 U.S.C. § 1085(e)(3)(C) following expiration of the parties' collective bargaining agreement, should be included in the calculation." ECF 26-2 at 439. In *Domtar*, the rehabilitation contribution rates at issue were "imposed by operation of law after the Employer's Agreement with the Union expired and a new Agreement complying with scheduled increases set forth in the default schedule of the Rehabilitation Plan[] was not adopted." ECF 25-1 at 36. These rehabilitation contributions "were not agreed upon in any [CBA] or related agreement. Instead, they were implemented under a Rehabilitation Plan issued, unilaterally, by the Fund." *Id.* at 53; *see also* ECF 25-2 at 10 (*CBC*).

In contrast, at issue here is a rehabilitation contribution rate that was expressly adopted in a CBA, not one imposed by law under section 1085(e)(3)(C). *See* ECF 26-2 at 439 (Ironworkers arbitrator explaining "*Domtar* and *CBC* . . . are inapposite here" because, "[i]n the language of the *C & S* court, neither *Domtar* nor *CBC* involved contribution rates . . . set by CBA's . . .") (internal quotation marks omitted). In sum, the decisions cited by Employers, *see* ECF 23 at 31; ECF 29 at 11–13, do not undercut, but rather reinforce, the conclusion that a rehabilitation

contribution rate adopted in a CBA is an obligation to contribute arising under that CBA, and therefore should be included when calculating withdrawal liability.

Most adjudications which address the precise question presented to this Court—whether pre-MPRA rehabilitation contribution rates *recorded in the CBA* should be included when calculating annual payments for withdrawal liability based on obligations arising under a CBA— conclude that these rates should be included.[7] In *Seattle Area Plumbing & Pipefitting Industry Journeyman & Apprentice Training Trust (SAPP) v. Western States Office and Professional Employees Pension Fund*, ECF 28-2, the arbitrator rejected the same arguments that Employers bring here. *See* ECF 28-2 at 9-10. The *SAPP* arbitrator explained:

> There is some force in SAPP's argument that 'arising out of' means more than simply 'contained in.' For example, if ERISA provided that an employer who remains in a pension plan in critical status *must* enter into a collective bargaining agreement providing for contribution rates consistent with the supplemental schedules in the rehabilitation plan, it could justifiably be argued that the 'obligation to contribute' arose out of the statute, not the CBA. . . . [W]hile Section 1085(e) imposes obligations on the *Fund* to adopt a rehabilitation plan and provide schedules of contribution rates, ***it does not contain any provision requiring the bargaining parties to adopt those rates in their CBAs***. Under the statutory scheme, upon receiving the Fund's rehabilitation plan and schedules, SAPP had several options.

*Id*. at 9 (emphasis added). The *SAPP* arbitrator went on to discredit the employer's argument that "the statutory *limits* on its freedom to bargain for contribution rates means that the supplement schedules' rate did not 'arise out of' the CBA . . . . [L]ack of complete freedom to select contribution rates in its CBAs (without incurring statutory surcharges) does not, in my opinion,

---

[7] See ECF 1 at ¶ 16 ("The Arbitrator's Award [in *IBEW*] is unprecedented.").

mean that the supplement schedules agreed to in SAPP's CBA did not 'arise out of' those CBAs." *Id.* at 10 (emphasis in original). This Court agrees.

As the SAPP arbitrator explained, the Employers "had several options." ECF 28-2 at 9. They could, of course, exit the Fund. But they could also stay in the Fund and choose between rehabilitation contribution rate options that the plan sponsor was statutorily required to "provide to the bargaining parties" and "which, if adopted, may reasonably be expected to enable the multiemployer plan to emerge from critical status." 29 U.S.C. § 1085(e)(1)(B)(i). They could choose not to "adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule from the plan sponsor," thereby triggering imposition of one of the sponsor's provided schedules, designated as the default, instead. *Id.* at § 1085(e)(3)(C). As detailed more below, section 1085(e) consistently characterizes post-critical status decision-making regarding rehabilitation schedules as bargaining and as a process in which the employers have choices. *See also Honerkamp*, 692 F.3d at 132 (describing how a "rehabilitation plan would figure prominently in any negotiations" and how negotiating parties "considered the rehabilitation plan's schedules as well as the possibility of [the employer's] withdrawal" from the fund). The "lack of complete freedom" to choose what levels of rates might be included in the CBA does not mean that a "bargaining part[y]" did not negotiate. ECF 28-2 at 9-10.

### 3.  Giving Effect to All Statutory Provisions

Employers argue that rehabilitation contribution rates cannot "arise" from a CBA because so holding would render the provision that enforces the schedules imposed under section 1085(e)(3)(C), section 1085(e)(3)(C)(iv), meaningless. ECF 23 at 21–23. "[O]ne of the most basic interpretive canons [is] that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

Indeed, the Supreme Court has been "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988)).

However, because section 1085(e)(3)(C)(iv) is properly read as enforcing noncontractual, section 1085(e)(3)(C)-imposed rehabilitation contribution rates while section 1145 enforces contractual ones, no portion of the statute is superfluous. Employers argue that section 1085(e)(3)(C)(iv) enforces all rehabilitation contribution rates, regardless of whether they have been contractually adopted in a CBA or were imposed by law under section 1085(e)(3)(C). ECF 23 at 24-25. Section 1085(e)(3)(C)(iv) states, "Any failure to make a contribution under a schedule of contribution rates provided under this subsection shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." The plain language of section 1085(e)(3)(C)(iv), and its structural location within section 1085(e)(3)(C), which details the procedures imposing a schedule by law after a failure to adopt, make clear that the enforcement provision applies where the parties have not adopted a CBA. This Court agrees with the Ironworkers arbitrator, who distinguished between contribution increases "imposed by law pursuant to [section] 1085(e)(3)(C)" and those "set by CBA's." ECF 26-2 at 439.  The enforcement provision within section 1085(e)(3)(C) thus does not enforce all rehabilitation plan contributions without distinction, as Employers claim.

While *contractual* contribution rate obligations are enforced through section 1145, section 1085(e)(3)(C)(iv) remains necessary to enforce *noncontractual* contribution rate obligations imposed under section 1085(e)(3)(C). Further, all the statutory terms defining and outlining the rehabilitation process throughout section 1085(e) make it clear that the inclusion of

PAGE 19 – OPINION AND ORDER

a rehabilitation schedule is subject to bargaining. *See, e.g.,* 29 U.S.C. § 1085(e)(1) (plan sponsor "shall provide to the bargaining parties 1 or more schedules . . . which, if adopted, may" help); 29 U.S.C. § 1085(e)(3) (describing a rehabilitation plan as including "options or a range of options to be proposed to the bargaining parties"); 29 U.S.C. § 1085(e)(3)(B)(iii) (limiting the ability to change any "schedule of contribution rates provided by the plan sponsor and relied upon by bargaining parties in negotiating" a CBA); 29 U.S.C. § 1085(e)(3)(C)(i)(II) (describing consequences if "the bargaining parties . . . fail to adopt a contribution schedule with terms consistent . . ."); *see also Honerkamp,* 692 F.3d at 132 (describing how a "rehabilitation plan would figure prominently in any negotiations" and how negotiating parties "considered the rehabilitation plan's schedules as well as the possibility of [the employer's] withdrawal" from the fund). Accordingly, giving effect to all the words in the statute requires the conclusion that rehabilitation contribution rates adopted in a CBA "arise under" that CBA for purposes of calculating withdrawal liability.

### 4.  Legislative History

The question posed in this case is limited to rehabilitation contribution rates in effect before the effective date of the MPRA, a 2014 statutory amendment to the PPA. *See* ECF 1 at ¶ 15 (describing the issue as whether "the pre-MPRA supplemental contributions" could be included in calculating withdrawal liability). The MPRA amendment excludes from withdrawal liability calculations any "increase in the contribution rate (or other increase in contribution requirements unless due to increased levels of work, employment, or periods for which compensation is provided) that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan." 29 U.S.C. § 1085(g)(3)(A).

Employers argue that the MPRA amendments clarify the law, and thus rehabilitation contribution rates adopted in a CBA were never intended by Congress to be included in

calculating withdrawal liability. ECF 23 at 33. The Fund argues the MPRA amendments "effected a substantive change in the law," excluding rehabilitation contribution rates adopted in a CBA from withdrawal liability calculations going forward when the statute had not done so before. ECF 27 at 24–25.

In statutory interpretation, "[w]here the statute's language is plain, the sole function of the courts is to enforce it according to its terms.'" *Cleveland*, 420 F.3d at 989 (quoting *United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241 (1989) (citations and quotations omitted). "The inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id*. (quoting *Ron Pair Enters*., 489 U.S. at 240).

Here, the statutory scheme as written before the 2014 amendment is coherent and consistent, and the statutory language is unambiguous. As explained above, the statute's treatment of the rehabilitation plan's implementation, the plan sponsor's obligations, the bargaining parties' choices, and enforcement given those choices are coherent and consistent across multiple subsections. Accordingly, this Court will "enforce it according to its terms." *Id*. There is no need to wade into legislative history arguments.

Further, as the Third Circuit noted when faced with similar legislative history arguments concerning the 2014 amendment in *C&S*, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *C&S*, 802 F.3d at 546 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc*., 447 U.S. 102, 117 (1980)) (internal quotation marks omitted). The legislative history arguments in this case are no more compelling than the ones rejected in *C&S*, and this Court accordingly finds no reason to engage in that "hazardous" exercise.

**CONCLUSION**

The Ironworkers arbitrator correctly determined that pre-MPRA rehabilitation contribution rates included in CBAs are included in withdrawal liability calculations. The IBEW arbitrator was incorrect to conclude otherwise. The Court GRANTS the Fund's Motion for Summary Judgment, ECF 27, and DENIES the Employers' Motion for Summary Judgment, ECF 23.

**IT IS SO ORDERED**.

DATED this 11th day of December, 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge